UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 06-282 (PLF) |
| | : | |
| v. | : | |
| | : | |
| LARRY POOLE | : | |

**GOVERNMENT'S MOTION FOR GUIDELINES CREDIT AND
MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves the Court, pursuant to § 3E1.1(b)(2) of the Sentencing Guidelines, to adjust the defendant's offense level down one level reflecting the defendant's early plea of guilty in this matter, which permitted the government to avoid preparing for trial and permitted the court to allocate its resources efficiently. The United States also submits this memorandum in aid of sentencing.

**I.   BACKGROUND**

The defendant was charged in a two count criminal Information with Attempted Enticement, in violation of 18 U.S.C. § 2422(b), and Possession of Material Involving Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5) and 2256. On October 3, 2006, the defendant pled guilty to Attempted Enticement, in violation of 18 U.S.C. § 2422(b), and Possession of Material Involving Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5) and 2256.[1] At that time the defendant admitted to the following:

On July 27, 2006, Metropolitan Police Detective Timothy Palchak went online in an

---

[1] The offense of Possession of Material Involving Child Pornography occurred in the District of Maryland. However, the defendant agreed to waive venue and plead guilty to that offense before this Court.

1

undercover capacity as part of a multi-jurisdictional Internet Crimes Against Children ("ICAC") Task Force. Detective Palchak was operating out of the ICAC satellite office in Washington, D.C. Detective Palchak used the screen name "daddysgrldc" while online.

Defendant Larry Poole, using the screen name "lkrnson1" initiated contact with "daddysgrldc" in a private Yahoo chatroom, and online internet communications between the defendant and "daddysgrldc" ensued. The defendant initiated the online communication at 12:35 pm. The defendant and "daddysgrldc" communicated in this online "chat" using instant text messages (IMs). The online communication continued for approximately two hours. During the course of the online communication, Detective Palchak identified himself as a thirteen year-old female residing in the District of Columbia and sent the defendant a photograph via the internet of a young child who was wearing a bathing suit with a panda bear on the chest. The defendant thought that the photograph was a picture of "daddysgrldc." The defendant responded to this photo by telling "daddysgrldc" "u look sexy" and "wish I were a panda bear." Later during the internet chat the defendant said "I love to see under the panda."

The defendant made the following statements to "daddysgrldc" during the online chats:

- im glad u r a virgin
- nvr had oral sex?
- wish I could be the first
- ud be ruined for the other guys
- u'd be wobbling for a few hrs
- legs would.t be working right

The defendant also told "daddysgrldc" that he didn't "need to fuck [her] the first time" and that

they could "just start with cuddling and petting . . . oral"  Further, the defendant asked "daddysgrldc" if she was hairy and asked her how big her breasts were.  See Exhibit A, Text of Online Chat between defendant and "daddysgrldc."

During the online communication, "daddysgrldc" told the defendant that her mother left for work at 2 or 3 pm, and that she would be home alone after that time.  The defendant made arrangements to meet "daddysgrldc" in front of 1317 Adams Street, NE, in Washington, DC, at 4:00 pm on July 27, 2006.  The defendant told "daddysgrldc" that he would be driving a small white pick-up truck.  At approximately 4:30 p.m. on July 27, 2006, the defendant arrived in front of 1317 Adams Street, NE, in Washington, DC.  The defendant arrived in a small white pick-up truck.  The defendant was stopped and placed under arrest, at which time he waived his Miranda rights and provided a videotaped statement in which he admitted that he had traveled from Westminster, Maryland, into Washington, DC, for the purpose of meeting "daddysgrldc."

The defendant agreed to permit law enforcement to search his home at 24 Webster Street, in Westminster, Maryland.  Later on July 27, 2006, law enforcement officers searched the defendant's home at 24 Webster Street, in Westminster, Maryland, and seized the following items: Philips PC Camera, Dell Inspiron P-3 2500 Model PP02L, Kodak DX3600 with serial number KJCAJ12605182, two 64 mb PNY CF Memory Cards, 1 64 mb Memorex CF Memory Card, VHS tape entitled "Teenage Rape," HP 9600 P-3 with serial number GFDM49120694A, Canon EOS Digital Camera, and SawDisk 64 mb CF Memory Card.  Detective Timothy Palchak later obtained a search warrant to search the Dell Inspiron computer that was seized from the defendant's home.  During the execution of that warrant, United States Attorney's Office Criminal Investigator John Marsh located twenty-seven  images of child pornography on the

3

defendant's computer. At least six of those images involved prepubescent minors or minors who had not attained the age of twelve years. All the images located on Poole's computer were taken to the National Center for Missing and Exploited Children (NCMEC), where they were compared with NCMEC's Child Recognition & Identification System (CRIS). The analysis resulted in six of the of the images being identified as known minor victims of child abuse. The defendant used his computer to possess and receive each of image of child pornography that was found on his computer.

At the time Larry Poole committed the offenses described above, he had a 2004 Maryland conviction for child abuse, he was on probation for that conviction, and he was listed on the national sex offender registry.

## II.     SENTENCING CALCULATION

### A.     Statutory Minimums and Maximums

Pursuant to 18 United States Code § 2422(b), Attempting to Entice a Minor to Engage in Sexual Activity carries a minimum sentence of 5 years imprisonment and a maximum sentence of 30 years imprisonment. Pursuant to 18 United States Code § 2252A(b)(2), Possession of Material Involving Child Pornography carries a maximum sentence of 10 years imprisonment.

### B.     Sentencing Guidelines Calculation

The Guidelines calculation utilized in the Presentence Report ("PSR") calculates the defendant's total offense level for the crime of Attempting to Entice a Minor to Engage in Sexual Activity at 26. See PSR ¶ 31. This calculation contemplates an enhancements of two levels pursuant to U.S.S.G. § 2G1.3(b)(3)(A) because the material involved the use of a computer to persuade, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual

contact.

The Guidelines calculation utilized in the PSR calculates the defendant's total offense level for the crime of Possession of Material Involving Child Pornography at 24. See PSR ¶ 30. This calculation contemplates the following enhancements: two levels pursuant to U.S.S.G. § 2G2.2(b)(2) because the material involved a prepubescent minor or a minor who had not attained the age of twelve years, two levels pursuant to U.S.S.G. § 2G2.2(b)(6) because the offense involved the use of a computer or an interactive computer service for the possession of the material, and two levels pursuant to U.S.S.G. § 2G2.2(b)(7)(A) because the offense involved at least 10 images, but less than 150 images.

The PSR calculates the defendant's criminal history as Category II. See PSR ¶ 46.

Assuming the defendant is given a three level adjustment for acceptance of responsibility, his Guidelines range for the offense of Attempting to Entice a Minor to Engage in Sexual Activity is 51 to 63 months, and his Guidelines range for the offense of Possession of Material Involving Child Pornography is 41 to 51 months. However, pursuant to U.S.S.G. § 3D1.4, the defendant qualifies for a multiple count adjustment, which gives him a total offense level of 25 and a Guidelines range of 63 to 78 months. See PSR ¶¶ 31, 40, 74.

### III. GOVERNMENT'S RECOMMENDATIONS

#### A. Acceptance of Responsibility

The government agrees that the defendant's base offense level should be decreased by three points pursuant to Section 3E1.1 of the Sentencing Guidelines. He entered a guilty plea early enough in the proceedings to avoid the government's having to prepare for trial, and he appears to have met the requirements of Section 3E1.1 with respect to cooperating in the pre-

sentence investigation.[2]  Accordingly, the government is moving the Court to grant the additional one level decrease in base offense level provided for in that Guideline provision.

      B.      <u>Application of the Federal Guidelines post-Booker</u>

Pursuant to the plea agreement, it is the government's position that the Court should impose a sentence at the low end of the guidelines range for each offense, but that the sentences should be served consecutively.  In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1).  <u>Booker</u>, 125 S. Ct. at 756. However, the Court expressly refused to invalidate the Guidelines in their entirety.  To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime.  Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines.  <u>See</u> 18 U.S.C. Section 3554(c)(2).  The sentence will then be subject to review by courts of appeals for "reasonableness."  <u>Id.</u> at 769.

In <u>Booker</u>'s wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  <u>See</u>

---

    [2]  The government does note, however, that defendant "did not answer questions relating to the filing of federal and local income tax returns."  <u>See</u> PSR ¶ 69.

Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S. Ct. at 767 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)). In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se. Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

      The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of

similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court. Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial

8

efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

     Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See Booker, 125 S. Ct. at 764. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review. See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of

appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. This is so, said the court in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah, 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 912. A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing. Therefore, the government respectfully recommends that the Court sentence the defendant within the Federal Guidelines range

calculated in the Presentence Report.

    C.    <u>Basis for Government's Sentencing Recommendation</u>

The defendant has received a number of significant benefits from this plea, and all the leniency he should receive is encompassed in the concessions already made by the government. The defendant received a three point decrease in his offense level as a result of his acceptance of responsibility, and the government agreed to request a sentence at the low end of the applicable Guidelines range. Furthermore, had the defendant not been permitted to waive venue and plead guilty in the District of Columbia to Possession of Child Pornography, he would be facing this charge in the District of Maryland, and would have received no multiple count adjustment. (This would have exposed him to an additional 41 to 51 months in prison.)

Furthermore, despite the defendant's wife's claim that the instant offense is "out of character for him," <u>see</u> PSR ¶ 52, a review of the defendant's criminal history proves that the instant offense is <u>entirely within defendant's character</u>. The government urges the court to consider the important, and highly disturbing fact that the defendant was a *registered sexual offender* when he committed the instant offenses. This registration stems from a 2003 Maryland case in which the defendant was initially charged with Child Abuse - Parent, Sex Offense - Third Degree, Child Abuse - Custodian, Indecent Exposure, and Prostitution. <u>See</u> PSR ¶ 43. On November 17, 2003, the defendant entered into an Alford Plea in the Circuit Court for Baltimore County, Maryland, and pled guilty to Child Abuse by a Parent. The defendant did not plead guilty to a sexual offense, yet the court still saw fit at sentencing on January 22, 2004, to order the defendant to register as a "child sexual offender." <u>See</u> Exhibit B, "Probation/Supervision Order." He was also ordered to have no contact with his nieces, and only Department of Social

Services approved contact with his daughter.[3]

Despite defendant's prior conviction, and the opportunity he was given when he received only a probationary sentence for that offense, the defendant continued his pattern of preying on young girls by going online and propositioning what he thought was a 13 year old girl.  And not just any 13 year old girl, but a vulnerable one who was home alone, and who said "it sucks.  me and my mom just moved here not to long ago she split with my dad."  See Exhibit A at 1.  "Daddysgrldc" also told the defendant that her mother left at 2:00 p.m. or 3:00 p.m., and sometimes did not return home until 12:00 a.m. or 1:00 a.m.  Id. at 2.

The defendant's possession of child pornography is also reprehensible.  His actions in amassing a library of child pornography fueled an industry that victimizes children throughout the world.  The serious punishment recommended by the United States Sentencing Commission reflects Congressional concerns that consumers of child pornography, such as the defendant, create the market that causes producers of child pornography to kidnap, drug, and otherwise coerce the young children who are subjects of this ugly contraband.

The Ninth Circuit has articulated that "commercial child pornography" (images obtained from the Internet, just like those possessed by this defendant) is the industry targeted by Congress; moreover, the most effective method of eradicating the industry is to punish the ultimate consumer.  United States v. Adams, 343 F.3d 1024, 1034 (9th Cir. 2003).

> Th[e] legislative history leads us to three observations:  (1) Congress determined that child pornography is a multi-million dollar industry in which sexually explicit depictions of children are bought, sold, and traded interstate; (2) Congress decided to "stamp out" the market for child pornography by criminalizing the production,

---

[3] A relative of one of the minor victims in this case plans to attend the January 17, 2006 sentencing hearing, and would like to address the Court at the hearing.

> distribution, receipt, *and possession* of child pornography; and (3) Congress thought it could strike a blow to the industry by proscribing possession of child pornography "because those who possess and view child pornography encourage its continual production and distribution."

Id. at 1032, citing 136 Cong. Rec. at S4730 (emphasis in original). This Ninth Circuit panel stressed the national interest in punishing consumers, because "possession of commercial child pornography [whether the possession resulted from inter- or intrastate sale, trade, or dissemination] substantially affects the national market for child pornography." Id. at 1034; see also United States v. Rodia, 194 F.3d 465, 477 (3d Cir. 1999) (Polaroid photographs of "naked boys in various sexually explicit poses" does indeed fall within federal reach, because "possession of 'home grown' pornography may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography"). The defendant should acknowledge that his pursuit of these materials does indeed victimize children, since throughout the world, real children are forced or tricked into the degradation that is child pornography, for the mere gratification of adults like this defendant. Moreover, because the Internet has become the distribution medium of the photographs, the degradation of these children is permanent, continuous, and impossible to eradicate.

    Clearly, the defendant here fueled the national and international market for child pornography. The defendant's punishment should reflect the impact of his actions on the child pornography industry, and on the true victims, the children who were subjected to the illegal pornographic photographing of the many photographs in his collection. And the victims cannot, and should not, be considered simply in the abstract. They are real, flesh and blood victims of terrible crimes. They have names. They have pets, hobbies, families, and dreams. It is the

ultimate insult that all of the victims, whether rescued and identified or not, are left with a terrible burden to carry for the rest of their lives: the knowledge that not only were they victimized by the predators who used the victims to create pornographic images, but that these images remain in circulation, and are viewed again and again and again.

The child victims of pornography will be forced to live with the horrible and depraved sexual acts they were forced to commit for the rest of their lives:

> The trauma of sexual abuse on a child is different from such childhood traumas as experiencing the divorce of one's parents or even being the victim of physical abuse. . . . [F]our traumagenic dynamics – traumatic sexualization, betrayal, powerlessness, and stigmatization – form the core of the psychological injury inflicted by abuse. They alter children's cognitive and emotional orientation to the world, and create trauma by distorting children's self-concept, world view, and affective capacities.
>
> First, a child who is sexually abused is shaped in a developmentally inappropriate and interpersonally dysfunctional way, emerging with (1) inappropriate repertoires of sexual behavior, (2) confusions and misconceptions about his or her sexual identity and the role of sex in affectionate relationships, and (3) unusual emotional associations with sexual activities.
>
> Second, a child who is sexually abused by someone on whom he or she was vitally dependent experiences betrayal by (1) the perpetrator and (2) family members who are not sexually abusing the child but are unable or even unwilling to believe the child, thereby ignoring the child's cry for help. Moreover, child-victims who experience betrayal suffer from an intense need to regain trust and security, manifested in extreme dependency and clinging. As adults, they suffer from impaired judgment about the trustworthiness of other people or even experience hostility and anger towards personal relationships. Furthermore, anger stemming from betrayal may lead to aggressive, hostile or delinquent behavior as a way of protecting the self from future harm or as a way of retaliating against the initial abuse.
>
> Third, powerlessness occurs in sexual abuse when a child's

> territory and body space are repeatedly invaded against the child's will. Force and threat are not necessary for a child to feel powerless – the mere realization that he or she is trapped, combined with the fear of the consequences of disclosing his or her participation in sexual activity, can create a sense of powerlessness. Nightmares, phobias, hypervigilance, clinging behavior, and somatic complaints related to anxiety have been repeatedly documented among sexually abused children. As adults, the effects of powerlessness can include the impairment of a person's sense of efficacy and coping skills. . . .
>
> Fourth, stigmatization occurs when sexually abused children incorporate negative connotations related to their sexual experiences. Child-victims may feel isolated and may gravitate to various stigmatized levels of society, thereby becoming involved in drug or alcohol abuse, criminal activity, prostitution, extreme forms of self-destructive behavior, and suicide attempts.

Lydia W. Lee, Note, <u>Child Pornography Prevention Act of 1996: Confronting the Challenges of Virtual Reality</u>, 8 SOUTHERN CALIFORNIA INTERDISCIPLINARY LAW JOURNAL 639, 662-64 (1999) (quotation marks and footnotes omitted) (summarizing findings set forth in David Finkelhor & Angela Browne, <u>The Traumatic Impact of Child Sexual Abuse: A Conceptualization</u>, 55 AMERICAN JOURNAL OF ORTHOPSYCHIATRY 530, 531-36 (1985)).

The images on the defendant's computer are particularly disturbing, as some of them depict prepubescent children/children under the age of 12 years.[4]

## IV. CONCLUSION

Wherefore, the government respectfully requests that the Court sentence the defendant to 63 months of incarceration, to be followed by a five years of supervised release, with the

---

[4] It is the government's position that it is important for the Court to see these images, as they take this case out of the abstract realm and demonstrate the actual harm caused by child pornography. However, the government is reluctant to provide them to the Court before sentencing, because to do so would require the creation of yet another reproduction of the images. As such, the government plans to present them to the Court at the sentencing hearing.

following special conditions:

1) Registration as a sex offender for 25 years, pursuant to 120 Stat 587, Section 115(a)(2) (Adam Walsh Child Protection and Safety Act of 2006)

2) The defendant shall not possess or use a computer that has access to any on-line computer service at any location, including his place of employment, without the prior written approval of the probation office. "On-line computer service" includes, but is not limited to, any Internet service provider, bulletin board system, or other public or private computer network.

3) The defendant shall submit to periodic unannounced examinations of defendant's computer by the probation office.

4) The defendant shall not possess or use any data encryption technique or program.

5) The defendant shall maintain a daily log of all addresses accessed by way of any computer, other than those authorized for employment, and shall make the log available to the probation office for review.

6) The defendant shall consent to third party disclosure regarding computer related restrictions to any employer or potential employer.

7) The defendant shall not engage in employment, consulting, or associate in any way with children as a profession for the duration of his supervision.

8) The defendant shall not participate in any volunteer activity that involves contact with minors.

9) The defendant shall participate in mental health treatment specifically related to sexual offender therapy.

10) The defendant shall not associate with any known sex offender.

11) The defendant shall not reside with a child under the age of 18 without the express written approval of the minor's legal guardian and the written permission of the Court.

Respectfully submitted,

JEFFREY TAYLOR
United States Attorney

_____
Catherine K. Connelly
Assistant United States Attorney
Major Crimes Section, Mass.  Bar No. 649430
555 4th Street, N.W.  #4844
Washington, DC 20001
Phone: 616-3384
Fax: 353-9414

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney for the defendant, Tony Miles, this 10th day of January, 2007.

_____
Catherine Connelly
Assistant United States Attorney

# EXHIBIT A

# EXHIBIT B